UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-CV-22483-BLOOM/LOUIS

CIBELY MONTIEL

     Plaintiff,

v.

ANDREW SAUL,
Commissioner for Social
Security Administration,

     Defendant.

_____/

## REPORT AND RECOMMENDATIONS

**THIS MATTER** is before the Court on Plaintiff Cibely Montiel's Motion for Summary Judgment (ECF No. 17) and Defendant Andrew Saul's, Commissioner of the Social Security Administration, Motion for Summary Judgment (ECF No. 20). This Matter has been referred to the undersigned by the Honorable Beth Bloom, United States District Judge, for a Report and Recommendation (ECF No. 2). The undersigned has fully considered the motions and the record and is otherwise duly advised in the matter.

For the reasons set forth below, the undersigned recommends that Plaintiff's Motion be **GRANTED in part** and Defendant's Motion be **DENIED**. Further, the undersigned recommends the ALJ's decision be **REVERSED** and **REMANDED** with instructions to reassess and state with particularity her credibility determinations as to Plaintiff's subjective symptoms and limitations including the weight afforded to Plaintiff's treating physicians, and to reanalyze steps three through five of the Social Security Administration sequential inquiry.

1

## I.      PROCEDURAL BACKGROUND

This case involves an application for social security disability benefits under the Social Security Act ("the Act"), 42 U.S.C. § 401 *et seq*. On August 22, 2014 Plaintiff applied for social security disability benefits, alleging a disability beginning November 29, 2013. Plaintiff's application was initially denied on June 16, 2014 and again on reconsideration on September 16, 2014. Plaintiff sought a hearing, which was held on January 19, 2017 before ALJ Clara Aranda (R. 38-84). During the hearing, Plaintiff was represented by counsel, and both Plaintiff and a Vocational Expert testified.

On October 3, 2018, the ALJ issued a decision denying Plaintiff's application because she was not "disabled" within the meaning of the Act (R. 18-31). Plaintiff requested review of the ALJ's decision. The Appeals Council denied Plaintiff's request for review on May 10, 2019 (R. 1-6), rendering the ALJ's decision the "final decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986); 42 U.S.C. § 405(g). Plaintiff now seeks judicial review of the ALJ's decision. Both Parties have moved for summary judgment.

## II.      STANDARD OF REVIEW

Judicial review of the Commissioner's decision is limited to a determination as to whether: (1) there is substantial evidence in the record as a whole to support the ALJ's findings; and (2) whether the ALJ applied the correct legal standards. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (citing *Richardson*, 402 U.S. at 401). In determining whether such substantial evidence exists, a reviewing court should not re-weigh evidence or decide the facts anew. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). While we must give great deference to an ALJ's fact findings, *Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 822 (11th Cir. 2015), such a presumption does not attach to the ALJ's conclusions of law. *Brown v. Sullivan*, 921

F.2d 1233, 1236 (11th Cir. 1991).

## III.   THE RECORD

Plaintiff was born on April 21, 1973 and was a "younger individual" throughout the relevant period at issue as that phrase is used in 20 C.F.R. § 404, Subpart P, 200.00(h)(1). She has at least a high school education, and no past relevant work, according to the ALJ. Plaintiff claimed disability from an alleged onset date of November 29, 2013 (R. 20). Plaintiff had back surgery in November of 2013 which has resulted in Plaintiff's complaints of excruciating pain and extremity numbness since that time. Since 2013, Plaintiff has also suffered from cancer, and undergone chemotherapy and dealt with episodes of depression as a result of both her pain and cancer diagnoses.

### A.  Medical History

Plaintiff's earliest medical record is from November of 2013. Plaintiff saw Dr. Juan Carlos Ojea after a surgery on her back for pain. She complained to him of left hip, left leg, and lower back pain, which she described as continuous, aching, throbbing, and radiating into her left hip and leg, and was associated with numbness and weakness (R. 296). Her pain was reportedly exacerbated by sitting, standing, walking, lifting, and lying down (*Id.*). Plaintiff weighed 263 pounds and exhibited tenderness of the lumbar spine with decreased range of motion and painful range of motion (R. 297). Plaintiff was diagnosed with chronic non-malignant pain, and Dr. Ojea performed an L5/S1 epidural block (R. 297-300).

Two days later, Plaintiff went to the emergency department at Baptist Hospital with complaints of chronic lumbar and lower lumbar back pain radiating to the left lower extremity (R. 322). A CT scan of the lumbar spine revealed a sizeable disc herniation arising form L5/S1 level and inferiorly extruded with sac compression; and asymmetric disc bulging to the left at L4/5 (R. 323, 365-66). She was noted to be in serious condition and diagnosed with back pain, lumbar radiculopathy, and herniated disc (R. 324). She was initially placed under observation but converted to inpatient status on November 29th (R. 329, 337),

a subsequent MRI of the lumbosacral spine was indicative of encroachment on the thecal sac and an extrusion of the disc over the left cauda equine nerves, and she was deemed to be at increased risk of neurological deficits (R. 329, 361-62). The next day, she underwent a left L5/S1 hemilaminectomy, medial facetectomy, microdiscectomy, and intraoperative fluoroscopy performed by Dr. Vitaly Siomin (R. 348-50). She was discharged on December 1st and advised she would likely be able to return to work in two weeks, but that she must follow up with a neurosurgeon before going back to work (R. 330). She was instructed not to do any twisting movements, no driving, no bending, and no lifting greater than 10 to 20 pounds until cleared (*Id*.).

Later in December, Plaintiff returned to Dr. Siomin for post-operative follow-up (R. 727-28). She reported significant improvement in her radiating pain on the left side, but noted she was still having on-and-off bouts of lower back pain radiating down both buttocks (R. 727). She also complained of still having some numbness sensation all the way down to the top left of the left foot (*id*.). During the examination, Plaintiff was able to walk on her heels and toes but had to stop due to lower back pain (*id*.). While Dr. Siomin's notes were generally positive, Dr. Siomin emphasized the importance of losing weight, as Plaintiff was "very morbidly obese" and it could be part of the reasons she was still having pain (*id*.). She was given a temporary disability certificate and was recommended that she avoid forward bending and weightlifting (R. 728).

Five days later, Plaintiff returned to Dr. Ojea with complaints of left hip, left leg, and lower back pain (R. 291). Her pain was reportedly exacerbated by sitting, standing, walking, lifting, and lying down (*id*.). On physical examination, she weighed 265.2 pounds and exhibited reduced cervical range of motion with pain on extension, painful range of motion of the left foot, reduced muscle tone, reduced sensation, and positive straight leg raise (R. 292). She was diagnosed with chronic non-malignant pain, and Dr. Ojea performed a lumbar transforaminal block (R. 292-95). The same day, Plaintiff went to the emergency

department at Baptist Hospital with complaints of bilateral buttock pain with bilateral lower extremity pain and numbness, but she left before she could be seen by a physician (R. 274-75).

Later in December, Plaintiff went to the emergency department at Baptist Hospital and stayed there for two days. She complained of lower back pain with radiation to both lower extremities and some numbness and decreased sensory on the dorsal aspect of the left foot (R. 390-91). An MRI was performed which revealed ventral soft tissue within the canal compressing the ventrolateral thecal sac and the existing left S1 nerve root, likely secondary to exuberant production of postoperative granulation tissue (R. 415-16). An MRI showed moderate degenerative changes (R. 413-14).

During that stay, Plaintiff was referred for a psychology evaluation due to suspected adjustment disorder (R. 399). In the mental examination, she reported anxiety due to the interruption that her current condition was causing to her life, including not being able to work (R. 400). Dr. Andres Cartaya, Ph.D. opined that plaintiff exhibited anxious mood with congruent affect and was at times tearful. He diagnosed her with adjustment disorder with mixed depressed mood and anxiety and advised to seek outpatient therapy (*id.*).

Plaintiff then underwent five sessions of physical therapy beginning on February 5, 2014 (R. 440-41). However, she was discharged from the program on February 19 with no improvement because she was in too much pain (R. 441).

On February 17, 2014, Plaintiff again went to the emergency department at Baptist Hospital with complaints of back pain radiating to the left hip, thigh, knee, calf, and foot causing a tingling sensation (R. 462). She was discharged the same day and directed to follow up with Dr. Siomin (R. 464). On February 21, 2014, Plaintiff went to Jackson Memorial Hospital emergency department with complaints of severe pain on the back of her hip with pain radiating down the left leg causing numbness, as well as pain in her pelvis (R. 933-34). She was discharged the same day with diagnoses of low back pain,

lumbosacral strain, ovarian cyst, and uterine fibroids (*id*.).

Plaintiff saw Dr. Glen Manzano for a second opinion regarding her complaints of low back pain, as well as bilateral buttock and leg pain radiating down to the ankles (R. 1228). Dr. Manzano assessed Plaintiff and noted that she was limited by pain in her upper and lower extremities (R. 1229). Dr. Manzano advised that Plaintiff should seek a comprehensive rehab program to include aqua therapy for six weeks along with the use of Lyrica and Celebrex to treat her pain (*id*.).

In May of 2014, Plaintiff returned to Dr. Manzano (R. 1158-1159). She complained of new onset neck pain as well as continued pain in her back and legs (R. 1158). She also reported pain in her arms (*id*.).

Later in May she returned to Baptist Hospital emergency department with complaints of vaginal bleeding and sharp, constant pain in the right side of her pelvis (R. 474). A CT scan revealed a multilobulated cystic lesion and she was advised it could either be an infection or cancer and was advised to follow up with her gynecologist (R. 478). She was seen a few days later in the emergency department and was again advised to follow up with her gynecologist (R. 503). Upon following up with a gynecologist, Dr. John P. Diaz, M.D., Plaintiff was diagnosed with neoplasm of the ovary, intramural leiomyoma of the uterus, and pelvic pain, and was advised to undergo surgery (R. 812).

In June 2014, Plaintiff returned to Dr. Manzano with complaints of significant neck and lower back pain, as well as leg pain (R. 926). Later that month, x-rays of the lumbar spine revealed mild levoscoliotic curvature of the lumbar spine with the apex at L3; mild disc space narrowing at the L5/S1 level with facet arthropathy; and mild degenerative change of the inferior aspect of the SI joints bilaterally (R. 908). She then saw Dr. Manzano again later that month with similar continued complaints (R. 1197). At this appointment, Dr. Manzano recommended continuing physical therapy once Plaintiff had recovered from her hysterectomy (*id*.).

Two days after seeing Dr. Manzano, Plaintiff was admitted into South Miami Hospital with preoperative diagnosis of adnexal mass and pelvic pain (R. 809). She spent a night in the hospital and was discharged the next day with post-operative diagnosis of State IV endometriosis, uterine fibroids, and left endometrioma (*id.*). On August 13, 2014, Plaintiff underwent a right revision tympanoplasty, mastoidectomy, and ossicular chain reconstruction (R. 909).

On August 14, Plaintiff sought the advice of another doctor, Dr. Jose Mena. She reported that her pain is generalized and affecting her quality of life (R. 913). Dr. Mena examined Plaintiff and referred her for fibromyalgia management and increased her dosage of Lyrica to help better control her pain (*id.*).

In September 2014, Plaintiff presented to Dr. Adriana Valbuena Valecillos at the UHealth Physical Medicine and Rehabilitation Clinic on referral from Dr. Mena for evaluation and management of fibromyalgia (R. 1207). He recommended an increased dosage of Lyrica, which she had been taking, but reported that it did not provide significant relief of her pain (*id.*). She indicated that after her November 2013 back surgery, she persisted with pain and numbness especially in the left lower extremity (*id.*). Plaintiff reported that since then, her quality of life changed and she now has generalized pain that does not get better with anything (*id.*). She is not able to stand or sit for a long time and is unable to ambulate for long distances secondary to the pain and weakness, especially in the left lower extremity (*id.*). She was started on physical therapy after seeing Dr. Mena, but she reported that it aggravated her pain and did not wish to continue (*id.*). She also admitted to fatigue, insomnia, anxiety, and depression (R. 1207-08). On examination, she was morbidly obese with a BMI of 42.77 and tearful (R. 1208). She exhibited limited range of motion in all extremities secondary to body habitus, positive edema in the bilateral lower extremities, varicose veins, as well as other symptoms (*id.*). Dr. Valbuena Valecillos concluded that the claimant's generalized pain was consistent with fibromyalgia and diagnosed her with an acute flare of fibromyalgia (*id.*). She also reported that depression is significantly affecting her pain tolerance and coping

mechanisms (*id*.).

On October 1, 2015, the claimant presented to the Jackson Memorial Hospital emergency department crying and complaining of pain all over, including severe back, neck, and muscle pain, as well as depression and anxiety (R. 1339). On physical examination, she had a BMI of 42.71, was crying and holding onto her husband, and had multiple positive trigger points (R. 1341-42). She was diagnosed with radiculopathy, pain, fibromyalgia, and benign hypertension, and referred to psychiatric emergency to be evaluated (R. 1347).

The next day, the claimant presented to Citrus Health Network for an initial psychiatric evaluation with Dr. Elizabeth Hoy (R. 1297-1300). She reported that she was in constant pain that was difficult to manage with medication (*id*.). Dr. Hoy observed that she was very unstable and endorsed experiencing frequent crying spells, decreased sleep, anhedonia, decreased memory and attention, and hopelessness. (*Id*.) On mental status examination, she presented with sad and depressed mood, labile affect, passive suicidal ideation, impaired attention and concentration, fair recent memory, and admitted that at times she hears her dead mother's voice at night (R. 1299). Dr. Hoy diagnosed Plaintiff with major depressive disorder, single episode, and prescribed Cymbalta as treatment therefor (R. 1299-1300).

In October of 2015, Plaintiff presented to Dr. Ignacio Coro with complaints of cervical and lumbar spine pain (R. 1282-1283). He diagnosed her with lumbar radiculitis, cervicalgia, osteoarthritis of the cervical spine, syndrome post-surgery lumbar disc herniation, and morbid obesity. He prescribed Plaintiff a course of physical therapy to be conducted for four weeks to treat her acute episode of lumbar radiculitis and cervical spine pain (R. 1153). Plaintiff followed up with Dr. Coro later in October and was diagnosed with lower back pain with acute exacerbation, disc narrowing and herniation at L5/S1, canal stenosis, acute exacerbation of cervical spine pain, and radiculopathy of the upper and lower extremities (R. 1280-81). He prescribed a lumbar support to limit range of motion and stabilize pain, recommended weight loss,

and referred her to a neurosurgeon for evaluation and treatment (R. 1281).

Plaintiff then returned to Dr. Ojea later that month with complaints of neck pain, low back pain, and extremity pain (R. 1350). Her pain was reportedly exacerbated by sitting, standing, walking, driving, lifting, weather change, lying down, and overhead activity (*id.*). She was diagnosed with chronic non-malignant pain (R. 1351).

Later in October 2015, Plaintiff went to Citrus Health Network and saw Dr. Stella Estruch with complaints of chronic pain, depression, difficulty coping with pain, frequent crying spells, decreased sleep, anhedonia, decreased memory and attention, hopelessness, and frustration (R. 1309). Dr. Estruch observed that Plaintiff was in a wheelchair and presented with crying at times, depressed and frustrated mood, constricted affect, and diagnosed her with major depressive disorder, single episode (*id.*).

In November of 2015, Plaintiff returned to Dr. Coro with complaints of lumbar spine pain radiating to the left lower extremity with weakness and numbness, as well as cervical spine pain radiating into the left upper extremity (R. 1288). Dr. Coro diagnosed her with lower back pain with acute lumbago, lumbar radiculitis, left disc herniation at L5/S1, acute cervical spine pain, and obesity (R. 1289).

In late November of 2015, Plaintiff returned to Citrus Health Network and was seen by Dr. Rafael Garcia. She was in tears, stated she was feeling very depressed with anxiety and suddenly stating that she wanted to kill herself by overdosing on her medication (R. 1310). Dr. Garcia involuntarily committed her pursuant to the Baker Act and sent her for admission into the crisis stabilization unit (*id.*). Dr. Garcia noted that Plaintiff was very labile and endorsed experiencing frequent crying spells, decreased sleep, anhedonia, decreased memory and attention, and hopelessness (R. 1301). She reported that she tried to take her pills in front of her husband as a gesture to end her life (*id.*). Plaintiff was diagnosed with major depressive disorder, recurrent, moderate, and discharged three days later on November 28 (R. 1303-04).

In December of 2015, Plaintiff returned to Dr. Estruch unchanged since her discharge from the

crisis unit, still feeling depressed, frustrated, crying, worrying, and in pain (R. 1311).

In February through June of 2016, Plaintiff went to two different hospitals for two different surgeries. After the second surgery, Plaintiff was diagnosed with gangrene essential hypertension, gastroesophageal reflux disease, hyperlipidemia, obesity, fibromyalgia, and a BMI of 40 to 44.9 (R. 1522).

In July, she returned to see Dr. Estruch with complaints of depression, helplessness, and crying spells (R. 1313). She reported being hospitalized for 15 or 16 days at Palmetto General Hospital after she had a panic attach in the disability office. She was again diagnosed with major depressive disorder, single episode (*id.*).

In August, she returned to Dr. Coro with complaints of right foot trauma with difficulty walking, as well as cervical and lumbar spine pain (R. 1762-63). She was diagnosed with lumbar radiculopathy, low back pain, lumbar herniated disc disease, trauma of the right foot, lumbar radiculitis, and obesity (R. 1763). That same day she returned to Dr. Estruch and was again diagnosed with major depressive disorder, single episode (R. 1315).

In September of 2016, Plaintiff saw Dr. Zoukaa Sargi for evaluations of right sided neck masses (R. 1900). Dr. Sargi recommended a fine needle aspiration biopsy, which Plaintiff agreed to have performed that day (R. 1902-03). Later that month, she returned to Dr. Sargi and underwent an excisional biopsy of the deep ganglion nodes for lymphoma workup and cultures (R. 1860). The results of that report indicated diffuse large B cell lymphoma (R. 1863). Three days later, Plaintiff returned to see Dr. Sargi who discussed the results and treatment options available (*id.*).

In October, Plaintiff began seeing Dr. Alvaro Alencar for treatment of the cancer. Later that month, Plaintiff presented to Dr. Estruch advising she had been diagnosed with cancer and that she would be starting chemotherapy shortly (R. 1778). Dr. Estruch again diagnosed Plaintiff with major depressive disorder, single episode (*id.*). Later that month Plaintiff underwent a bone marrow biopsy (R. 1976).

In November, Plaintiff underwent chemotherapy treatment and again returned to Dr. Ojea (R. 2002, 2266). Her pain was reportedly exacerbated by sitting, standing, walking, driving, lifting, lying down, overhead activity, and weather change (R. 2266).

The next month, Plaintiff returned to Dr. Estruch and presented with fear-driven thoughts, fear of dying, and not being able to be there for her daughter (R. 1777). She reported having undergone two chemotherapy treatments and admitted to staying in bed most of the day and experiencing decreased appetite, nausea, lack of energy, and episodes of vomiting (*id.*). Again Dr. Estruch diagnosed her with major depressive disorder, single episode (*id.*).

In January and February of 2017, Plaintiff went to University of Miami Hospital emergency department with neutropenic fever alert due to chills and recent chemotherapy, both times she was admitted, administered antibiotics and discharged (R. 2139, 2155). Additionally, in February, she underwent her sixth chemotherapy cycle (R. 2109).

In April she again returned to Dr. Estruch and was again diagnosed with major depressive disorder, single episode (R. 2270). Dr. Estruch noted that she was hypersensitive and very anxious (*id.*).

In May of 2017, Plaintiff spent six days in the hospital with a facial rash and went to see Dr. Delgado for her depression (R. 2227, 2271). Dr. Delgado noted that Plaintiff presented with crying, depressed and frustrated mood, and constricted affect (R. 2271). She was diagnosed with major depressive disorder, single episode (*id.*). She again saw Dr. Delgado in June of 2017. She presented with the same symptoms and was again diagnosed with major depressive disorder, this time recurrent and severe (R. 2272). She returned again to Dr. Delgado in July and was again diagnosed with major depressive disorder, recurrent, severe (*id.*). She saw him again in August with the same result (R. 2274). In September, she saw him again with the same result (R. 2275).

In October of 2017, Plaintiff again saw Dr. Ojea with complaints of neck, back and extremity pain

(R. 2264). Her pain was reportedly exacerbated by sitting, standing, walking, driving, and weather change (*id*.). She was diagnosed with chronic non-malignant pain (R. 2265).

Plaintiff returned to Dr. Delgado in November reporting sadness, crying spells, anxious mood, pessimistic thinking, ruminations, and reduced concentration (R. 2276). She was again diagnosed with major depressive disorder, recurrent, severe (*id*.).

### B. Hearing Before the ALJ

At the hearing before the ALJ, Plaintiff testified that she lived with her husband and 14-year old daughter (R. 51). She stated that she rarely drives because she feels a lot of weakness (R. 51-52). She testified that she experiences immense back pain and that her left leg from her knee down is always numb (R. 56). She attempted to return to work in 2015 at a doctor's office, but the doctor for whom she worked started noticing she was having difficulties and decreased her hours (R. 56). She testified that her left leg is completely numb and weak, and that she has drop foot syndrome (R. 59). Further, she stated that she has numbness from her neck down through her left arm and into her hand (R. 61, 63-64). The numbness intensified with her cancer and she has difficulties sleeping (R. 61).

Plaintiff testified that her aunt and husband help her shower and take care of her personal hygiene (R. 65-66). Even before her cancer diagnosis, bathing was a problem due to her left foot brace (R. 66). Her husband does all the cooking and her aunt, neighbor, and daughter do the housework (*id*.). Both before and after her cancer diagnosis her husband, aunt, and daughter did all of the grocery shopping (*id*.) and her aunt and daughter did all laundry (*id*.).

Plaintiff further testified that after her back surgery but before her cancer diagnosis, she would spend a typical day in bed crying and worrying about things like whether she would be able to see her doctors (R. 69). She testified that she was not interested in watching TV and she would stay in her bed in her "little world, covered all the way to [her] head" (*id*.). She testified that after her cancer diagnosis things

12

have gotten worse (*id*.).

### C.  The ALJ's Decision

The ALJ issued her decision on October 3, 2018 wherein she concluded that Plaintiff was not disabled (R. 18-31). She concluded at step one of the sequential evaluation process that claimant had not engaged in substantial gainful activity since the alleged onset date of November 29, 2013. At step two, she found that Plaintiff's impairments of post laminectomy, cervical and lumbar degenerative disc disease, fibromyalgia, bilateral hand numbness and tingling, cervical and lumbar radiculopathy, obesity, adjustment disorder with mixed depressed mood and anxiety vs. single episode major depressive disorder, and diffuse large B- cell lymphoma and follicular lymphoma status post chemotherapy were all "severe" (R. 21).

At step three, the ALJ concluded that at no point in the entire period at issue did Plaintiff have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. The ALJ concluded claimant had the following residual functional capacity:

> from the alleged onset date through October 1, 2015, the claimant had the residual functional capacity work at the sedentary exertional level with the following limitations: never climb ladders, ropes, or scaffolds; never work at unprotected heights. She could not kneel or crawl, occasional bending at her knees. She must avoid concentrated exposure to extreme heat and extreme cold. She must avoid vibrations, must avoid concentrated exposure to humidity. Beginning October 2, 2015, she has had the same residual functional capacity except in addition, she can understand and remember simple instructions; perform simple, routine, and repetitive tasks; can make simple work-related decisions; and is able to interact frequently with supervisors, coworkers, and the general public.

(R. 22-23).

At step four, the ALJ concluded that Plaintiff had no past relevant work (R. 29). At step five, the ALJ concluded that Plaintiff would be able to perform the requirements of representative occupations such as checker II, benefits clerk, and surveillance system monitor (R. 30). Further, the ALJ found that beginning October 2, 2015, Plaintiff could also perform the requirements of representative occupations

such as document preparer and order clerk (R. 30-31). Therefore, the ALJ concluded that claimant had not been under disability as defined in the Act from November 29, 2013 though the date of decision (R. 31).

## IV. DISCUSSION

On appeal, Plaintiff argues that the ALJ's decision to deny her benefits was deficient. First, Plaintiff argues that the ALJ failed to articulate the weight she afforded the opinions of Drs. Ojea, Siomin, Angeli, Manzano, Diaz, Mena, Valbuena Valecillos, Hoy, Coro, Garcia, Delgado, Sargi, and Alencar. Second, she avers that the ALJ failed to set forth good cause for according just "marginal weight" to the opinions of the claimant's treating psychiatrist, Dr. Estruch. Third, she avers that the ALJ's RFC finding is not supported by the substantial evidence of the record. Fourth, she avers that the ALJ failed to properly assess the Plaintiff's alleged symptoms and limitations.

Defendant avers that the ALJ properly considered the medical opinions in the record but was not required to weigh each and every single piece of evidence, that the ALJ articulated good cause for affording the treating psychiatrist's opinion marginal weight, and that the ALJ correctly assessed the alleged symptoms and limitations and her findings are supported by the substantial weight of the record.

In Plaintiff's Reply, she agrees that the Commissioner should not be required to articulate the weight given to every single piece of evidence, rather that her argument requires the ALJ to review all of the treating sources and articulate a weight to each one based on the totality of the evidence. Additionally, the Reply avers that the weight the ALJ afforded to Dr. Estruch is not supported by good cause, and that the ALJ's findings of Plaintiff's alleged symptoms and limitations are not supported by the substantial weight of the record.

Upon review of the record, the undersigned finds that the ALJ failed to credit Plaintiff's alleged symptoms and limitations of her subjective pain, despite those symptoms and limitations being evidenced

by the medical records. In doing so, the ALJ also failed to either consider the opinions of the treating physicians or explicitly articulate good cause for discrediting their opinions. Accordingly, the undersigned recommends that the ALJ's decision be reversed and that the case be remanded with instructions to the Commissioner to articulate her credibility findings, accord proper weight to the opinions of Plaintiff's treating physicians, and to reassess steps three through five of the Social Security Administration sequential process, as explained below. Because the undersigned reaches a decision that the ALJ failed to articulate the weight she afforded to Plaintiff's treating physicians and recommends a reassessment of steps three through five of the sequential process, the undersigned does not reach the merits of Plaintiff's second, and third arguments, as these arguments relate to evidence which may be re-assessed in the ALJ's new decision.

### A. The ALJ Erred in Articulating the Weight She Accorded Plaintiff's Treating Physicians in Finding that Plaintiff's Alleged Symptoms and Limitations Were Not Disabling

Plaintiff's first and fourth arguments are necessarily intertwined. In Plaintiff's first argument, she avers that that the ALJ failed to articulate the weight she afforded to Plaintiff's treating physicians. In her fourth argument, she avers that the ALJ failed to properly assess Plaintiff's alleged symptoms and limitations as they pertain to her subjective pain. As explained further below, if Plaintiff's subjective complaints of pain are supported by objective, medical evidence, the ALJ is required to explicitly articulate why she does not credit such evidence. The ALJ's failure to make such explicit articulation, coupled with her implicit discrediting of Plaintiff's complaints of pain, warrant remand.

The Defendant avers, however, that the ALJ's statement that she considered all the evidence, and her decision in general, demonstrates that she properly evaluated the evidence in accordance with the regulations. The Defendant avers that requiring the ALJ to weigh each piece of evidence in the record would have the absurd result of construing nearly 2000 pages of medical records as "medical opinions." Def. Mot. For Sum. Judgment (ECF No. 20 at 6). However, as Plaintiff articulates in her Reply, this

misconstrues her argument. Rather, she avers that the ALJ should have assessed each doctors' opinion and articulated what weight she afforded each of the doctors' opinions, not necessarily each and every piece of medical evidence of the record. Additionally, she avers in Reply that the ALJ's failure to consider, or improper discounting of, the objective medical evidence lead the ALJ to the erroneous finding that Plaintiff's complaints of pain were non-debilitating.

The ALJ found in her decision that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were "not entirely consistent with the medical evidence and other evidence in the record" (R. 24). When a Plaintiff attempts to establish a disability through her own testimony of pain or other subjective symptoms, the Court of Appeals for the Eleventh Circuit uses a three part "pain standard." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. *Id*. (citing *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986). Plaintiff's subjective testimony supported by medical evidence that satisfies the standard is itself sufficient to support a finding of disability. *Id*. However, if the ALJ decides not to credit such testimony, she must articulate explicit and adequate reasons for doing so. *Id*. Failing to articulate the reasons for discrediting subjective pain testimony requires, as a matter of law, that the testimony be accepted as true. *Id*.

Here, the ALJ implicitly rejected Plaintiff's subjective complaints of pain. In her decision, the ALJ bases her RFC finding on her determination that the Plaintiff's alleged symptoms are partially but not sufficiently consistent with the objective medical or other evidence (R. 29), yet the ALJ fails to articulate "explicit and adequate reasons for doing so." *Id*.

Plaintiff testified at the hearing that that since her surgery in 2013 she has experienced "[p]ain, lots

of pain, always cervical and lumbar." (R. 60), that Plaintiff experienced daily pain in her neck (R. 62), that she could not sleep at night because of "a lot of pain all over [her] body, [her] lower back" (R. 65), and that she used a wheelchair since her back surgery in 2013 because the "pain was so much" (R. 67).

While the ALJ does not explicitly state that she rejects this testimony, she implicitly does. The ALJ finds in her decision that Plaintiff's use of a wheelchair was not medically necessary or prescribed and that Plaintiff was able to ambulate after chemotherapy (*id*); she also states that Plaintiff had an excellent clinical response to chemotherapy with minimal complications or infections and that her mental examinations were generally normal except mood and affect (*id*.).

However, the ALJ's decision fails to articulate "explicit and adequate reasons" for failing to credit Plaintiff's subjective pain testimony as required. A review of the record demonstrates that medical evidence does support Plaintiff's testimony because medical opinions in the record given by her treating physicians appear to substantiate her subjective complaints of pain. The ALJ's opinion however does not indicate whether it credits or rejects the findings of these treating physicians, which the Plaintiff also argues is error.

Plaintiff's first argument avers that the ALJ's failure to explicitly weigh the opinions of Plaintiff's treating physicians was error. Defendant responded by averring that such an argument would necessitate the ALJ weighing each piece of evidence which would be an absurd result. Defendant avers that the Plaintiff's definition of what constitutes a medical "opinion" is too inclusive and the ALJ cannot be required to explain her rationale in weighing each piece of evidence in the record. Defendant cites to *Dyer v. Barnhart*, 395 F.3d 1206 (11th Cir. 2005), for the proposition that there is no rigid requirement that the ALJ specifically refer to every piece of evidence in her decision. While this may be true, as the Court found in *Dyer*, the ALJ must clearly "articulate explicit and adequate reasons for discrediting the claimant's allegations of completely disabling symptoms." *Id*. at 1210 (internal marks omitted). As

17

Plaintiff clarifies in her Reply she does not mean to suggest the ALJ weigh every piece of medical evidence in the record, which she agrees would be absurd, rather she contends that the ALJ must articulate the weight she accorded to the medical opinions of the treating physicians indicating Plaintiff's completely disabling symptoms. In the context of Plaintiff's fourth argument, the ALJ's failure to articulate the weight she accords each of Plaintiff's treating physicians prohibits the Court from determining whether the ALJ's decision in rejecting Plaintiff's subjective complaints of pain is rational and supported by substantial evidence.

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the plaintiff's] impairment(s), including [the plaintiff's] symptoms, diagnosis and prognosis, what [the plaintiff] can still do despite impairment(s), and [the plaintiff's] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). Absent "good cause," and ALJ is to give the medical opinions of treating physicians "substantial or considerable weight." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011).

In assessing the medical evidence, the ALJ must state with particularity the weight she afforded to the different medical opinions and the reasons therefor. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987) (*per curiam*). "In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence. *Winschel*, 631 F.3d at 1179. When the ALJ fails to "state with at least some measure of clarity the grounds for her decision," the Court should decline to affirm "simply because some rationale might have supported the ALJ's conclusions." *Id*.

While the Commissioner argues that the ALJ was not required to consider the treating physicians' treatment notes because they did not constitute "medical opinions," the Eleventh Circuit has found that such an argument defies the regulations. *See Winschel*, 631 F.3d 1179. Plaintiff's several treating

physicians' treatment notes include descriptions of Plaintiff's symptoms, diagnoses, and judgments about the severity of her impairments, and clearly constituted "statements from [a] physician ... that reflect[s] judgments about the nature and severity of [Plaintiff's] impairment(s), including [Plaintiff's] symptoms, diagnosis and prognosis, what [Plaintiff] can still do despite impairment(s), and [Plaintiff's] physical or mental restrictions." *Id.* (quoting 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)).

The ALJ's finding regarding Plaintiff's disability and subjective complaints of pain are contradictory to that of the medical opinions of Plaintiff's treating physicians. The ALJ's finding that Plaintiff's use of a wheelchair was not medically necessary, and that Plaintiff could ambulate after chemotherapy implies that Plaintiff's subjective complaints of pain were unwarranted and that the findings of her treating physicians were discredited.[1]

However, such a conclusion is contradictory to certain of the objective medical evidence and opinions given by Plaintiff's treating physicians. For example, Dr. Ojea's treatment notes, after Plaintiff's chemotherapy, indicate that Plaintiff complained of neck, back and extremity pain (R. 2264), which was reportedly exacerbated by sitting, standing, walking, driving, and weather change (*id.*). Dr. Ojea indicates in his treatment notes that Plaintiff's pain decreased her ADL/Function (R. 2264). Such an opinion reflects judgment about the nature and severity of Plaintiff's impairment because it shows a symptom of her pain, that she had decreased activities of daily life and the ability to function. While the ALJ's opinion mentions this visit (R. 28), it does not state what weight it accords Dr. Ojea's opinion that Plaintiff's activities of daily living were decreased. The decision simply summarizes Dr. Ojea's findings without indicating what weight the ALJ afforded it.

The ALJ's conclusion that Plaintiff could ambulate after chemotherapy fails to consider Dr. Ojea's

---

[1] Because the ALJ never addresses whether she credits or discredits Plaintiff's subjective complaints of pain and their limiting effect, to find otherwise would be to find that the ALJ's opinion lacked a determination as to Plaintiff's subjective complaints of pain, which would also require remand.

opinions that after chemotherapy Plaintiff had a decreased range of motion (R. 2265) and had pain that was exacerbated by sitting, walking, driving, weather change and standing (R. 2264), and that her activities of daily living were decreased (R. 2264). It is possible that the ALJ considered and rejected Dr. Ojea's opinions, but without clearly articulating the grounds for such a rejection, the Court cannot determine whether the ALJ's conclusions were rational and supported by the substantial evidence. *See Winschel*, 631 F.3d at 1179 (remanding because the ALJ either failed to consider the treating physician's opinions, or if he did consider, failed to articulate grounds for discrediting such opinions). The ALJ was required to articulate what weight she assigned to Dr. Ojea's opinions, as a treating physician, and, if necessary, explain why that weight was less than substantial or controlling. *See e.g. Baez v. Comm'r of Soc. Sec.*, 657 Fed. Appx. 864, 870 (11th Cir. 2016) (unpublished) (citing *Winschel*, 631 F.3d at 1179) (finding that although the plaintiff's doctor's records only included diagnoses and not medical source statements, the ALJ was still required to articulate the weight he afforded those records).

The conclusion by the ALJ that Plaintiff's outpatient mental examinations were generally normal, another subjective symptom or limitation, also implicitly discredits the opinions of Dr. Hoy, which indicated that Plaintiff was sad, depressed, anxious, and had a labile affect and found that she was "unable to make good decisions" (R. 1303). Dr. Hoy continued and diagnosed Plaintiff with major depressive disorder, recurrent, moderate (R. 1303-04).

It also implicitly discredits the opinions of Dr. Leticia Lenar Delgado, who saw Plaintiff over a span of six months from June to November in 2017, including after Plaintiff's chemotherapy, and found that Plaintiff had major depressive disorder, at times recurrent and at times single episode (R. 2270-76). In the ALJ's decision, she alludes to these records stating that the records reflect that Plaintiff was worried about her health and that she was discontinued on Prozac due to her concern about weight gain (R. 28) (citing to R. 2271), but the ALJ does not state what weight she affords Dr. Delgado's opinions that Plaintiff

had major depressive disorder. As with Dr. Ojea, because the opinions of these treating physicians contradict the ALJ's finding that Plaintiff's outpatient mental status examinations were "generally normal except for mood and affect" (R. 29), the ALJ either failed to consider their opinions or discredited them altogether, either of which is cause for remand. *See Winschel*, 631 F.3d at 1179.

The Court need not continue through all of Plaintiff's remaining treating physicians because the ALJ's failure to credit, or explicitly state good cause to discredit the opinions of the treating physicians above, warrants remand. As such, the ALJ will be required to afford proper weight to the opinions of the treating physicians of the record.

Because the undersigned finds that the ALJ has failed to state with particularity the weight given to different medical opinions and reasons therefor, and the Eleventh Circuit has found that in the absence of such a statement "it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence," *Winschel*, 631 F.3d at 1179, the undersigned cannot reach the merits of Plaintiff's third argument that the ALJ's opinion was not supported by substantial evidence of the record. Likewise, because the ALJ's determination of what weight to afford Dr. Estruch will change in the context of the weight she affords the other medical opinions in the record, the undersigned declines to reach Plaintiff's second argument.

Accordingly, the undersigned recommends that Plaintiff's Motion be **GRANTED in part**, and the Defendant's Motion be **DENIED** and the matter remanded.

## V.    CONCLUSION

Because the undersigned finds that the ALJ failed to articulate the proper weight given to each of the treating physicians' opinions in this case, and the ALJ failed to properly assess the Plaintiff's alleged limitations of her subjective pain, the undersigned respectfully recommends that Plaintiff's Motion be **GRANTED in part** and Defendant's Motion be **DENIED**, and that the ALJ's decision be **REVERSED**

and **REMANDED** with instructions to reassess and state with particularity her credibility determinations as to Plaintiff's subjective symptoms and limitations including the weight afforded to Plaintiff's treating physicians, and to reanalyze steps three through five of the Social Security Administration sequential inquiry.

Pursuant to Local Magistrate Rule 4(b), the parties have fourteen (14) days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Beth Bloom, United States District Judge. Failure to timely file objections shall bar the parties from a de novo determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein. *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993).

**RESPECTFULLY SUBMITTED** in chambers this 23rd day of June 2020.

_____
LAUREN LOUIS
UNITED STATES MAGISTRATE JUDGE